# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WILLIAM KYLER, #412628       *

Petitioner              *

v.                            *        Civil Action No. PWG-15-1078

WARDEN RICHARD E MILLER and   *
THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND          *

Respondents           *
                       ***

## MEMORANDUM OPINION

William Kyler, a self-represented Maryland prisoner, seeks habeas corpus relief pursuant 28 U.S.C. § 2254, challenging his convictions for various drug offenses for which he was sentenced to 65 years' imprisonment. Pet., ECF No. 1. Respondents have filed a Response, Resp't's Resp., ECF No. 4, and Kyler has submitted a Reply, Pet. Reply, ECF No. 14.[1] Upon this Court's instruction, ECF No. 9, Kyler filed a second Reply answering Respondents' procedural default argument. Pet.'s Proc. Def. Reply, ECF No. 10. After reviewing the Petition, Answer, and Replies, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts;* Loc. R. 105.6 (D. Md. 2016); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). Kyler's petition shall be DENIED because his Sixth Amendment claims were procedurally defaulted, there was sufficient evidence to convict him as

---

[1] Because Kyler's original Reply appeared to be missing several pages, *see* ECF No. 7 at 1–2 (skipping from page 1 to page 15), the Court provided Kyler with an opportunity to refile a complete version of the Reply, ECF No. 13, and he did so, ECF No. 14.

a kingpin, and he was not a recipient of an "illegal sentence." Additionally, based on these findings a certificate of appealability shall not issue.

## BACKGROUND & PROCEDURAL HISTORY

Kyler's convictions stemmed from a 2010 undercover operation conducted by the Calvert County Sheriff's Department. *Kyler v. State*, 96 A.3d 881, 884 (Md. Ct. Spec. App. 2014). As recounted by the Maryland Court of Special Appeals,[2] police officers testified that they observed Kyler conducting hand-to-hand drug transactions with confidential informants and others. *Id.* Officers testified that, as part of the operation, they also observed behavior that they deemed indicative of drug transactions at businesses owned by or connected to Kyler. *Id.* For example, Detective B. testified that, at a barbershop at which Kyler was observed to be present on more than 20 occasions between July and September 2010,

> Detective B. observed individuals pull in front of the barbershop, exit their vehicles, and go into the barbershop for such a short period of time that it was "impossible for them to get a haircut." . . . Although the barbershop offered only men's haircuts, women were seen entering the shop alone and leaving several minutes later. Detective B. recognized several of the individuals he observed entering and quickly leaving the shop from prior CDS [or "controlled dangerous substance"] cases. Based on the visitor traffic at the shop, including the cars pulling in front of the shop and the drivers entering only briefly, Detective B. believed that the activity he witnessed was consistent with illegal drug activity. . . . Appellant often visited the shop following days when there was a lull in activity. After his visit, however, traffic would pick up again. Appellant typically was inside the shop for approximately 30 minutes, although he stayed for one to two hours during several visits. Sometimes, he would enter and leave the shop carrying a gym bag or a suitcase.
>
> Detective B. also observed activity that was consistent with illegal drug transactions at the wireless telephone store owned by appellant. After customers entered the wireless shop, they left without a bag, cell phone, or any other merchandise one would expect to be sold at a wireless store. The shop itself did

---

[2] Kyler does not dispute the accuracy of the Maryland Court of Special Appeals' recitation of the facts. *See* Pet.'s Writ of Cert. & Or. 2, ECF No. 4-13 (stating that he "accept[s] the Statement of Facts" of that court).

not contain any cell phone or cell phone related merchandise; the only merchandise in the shop was clothing.

*Id.* at 884–85. Another officer conducted surveillance of an office building where Kyler's photography business was located. That officer testified that "[t]he exterior of the shop consisted of a door with the numbers 2–2–0 on the outside; there was no indication that the business was a photo shop" and the officer "never observed appellant enter or leave the shop with photography equipment." *Id.* at 885.

After conducting surveillance for roughly four months, the officers obtained search warrants for Kyler's residence, his photography shop and wireless telephone store, and the barbershop where Kyler was frequently present. *Id.* The search of the photography shop yielded

> a large quantity of suspected cocaine and suspected crack cocaine,[3] "several items used in the process to convert cocaine into crack cocaine," a digital scale, and $14,000. Corporal P. also found materials in the premises used to package cocaine and crack cocaine, as well as a candle, a hotplate, a mixer, and pyrex measuring glasses with a charred white residue. The police also found a lease agreement for the space in which the barbershop and wireless store were located.
>
> Appellant was present during the search of the photo shop. His person was searched, and the police recovered money, more than 10 grams of suspected crack cocaine, and "independence cards" issued to individuals other than appellant. Corporal P. testified that these cards often are used by people to pay for drugs.

*Id.* at 885 (footnote omitted). Additionally, a fingerprint was recovered from a measuring cup found at the photography shop; a fingerprint specialist with the Sheriff's Office testified that the fingerprint belonged to Kyler. *Id.* Although no drugs were uncovered at the other three locations that were searched, "[n]o items indicative of a functioning business, such as a cash register or a receipt book, were found" at the wireless store or barbershop. *Id.* At Kyler's residence, police found a money counter and 37 cell phones. *Id.*

---

[3] Specifically, officers recovered approximately 702.5 grams of cocaine and 142 grams of crack cocaine. Trial Tr. Vol. II, at 93:3-5, ECF No. 4-4.

The police officers subsequently learned of and obtained search warrants for two storage units leased in Kyler's name. *Id.* at 885–86. One of the storage units

> contained a dresser, which contained a black "laptop style carrying case" with $91,000 in cash and a piece of paper with numbers written on it. Detective G., who had conducted surveillance of appellant at the barbershop, identified the black laptop bag as the same bag that she had seen appellant carry into and out of the barbershop on at least one occasion.

*Id.* at 886.

Kyler proceeded to a jury trial in the Circuit Court for Calvert County Maryland. "At the start of appellant's trial, the State expressed its concern regarding undercover officers who remain assigned in an undercover capacity being required to testify in the open courtroom with their faces displayed to individuals who may be here watching the trial." *Id.* at 888 (internal quotation marks omitted). The State suggested shielding the officers from public view by allowing them to enter the courtroom wearing masks or to testify behind a screen. *Id.* Kyler's counsel expressed the view that the State's requested measures "would have a chilling effect in terms of giving appellant a fair trial," and sought to ensure that the officers could be accommodated "in such a way that's not obvious to the jury." *Id.* at 889 (brackets and internal quotation marks omitted).

> The court stated that there were two options it could use to protect the identity of the officers: "Keep the witness in the witness stand but clear the courtroom or have the witness testify over closest to the jury." . . . [A]ppellant's counsel stated: "I would ask the court to clear the courtroom if that's the choice." He then went on to elaborate on his election:
>
>> . . . [G]iven those two choices from the defense's point of view, it's probably best to have all witnesses testify. It doesn't suggest that one witness maybe has greater importance than another. It might be a chilling effect. I don't think these jurors—I think they're highly intelligent, and I think that they will perhaps view those precautions in a way that's suggestive that my client poses somehow a danger. They might misunderstand or misconstrue the purpose, and I think for those reasons . . . it's best to have the witness testify here and we'll clear the courtroom.

The State then expressed concern about appellant's "right to have a public trial," stating: "I don't want there to be an issue with respect to the lack of a public trial if certain witnesses are testifying without the public being permitted to observe." The State explained, however, that "we live in a small county and we have only so large a pool of officers to work in an undercover capacity," and as "they continue in that assignment," their testimony raises "an officer safety issue."

The court then suggested, as a way to accommodate the parties' concerns regarding officer safety and appellant's right to a public trial, that the courtroom could be closed, but individuals who wanted to listen to the testimony could do so by listening to recorded trial proceedings in another room. It believed that would resolve defense counsel's concern regarding "perhaps highlighting those witnesses to the jury panel" by having them testify behind a screen. The court stated that interested individuals could "listen in to the trial and then they can come back and observe. So I think we've solved both problems." Appellant's counsel voiced no objection to that arrangement.

After speaking to the court administrator regarding setting up a listening room, the court then made the following findings, noting again its view that the proposed arrangement "solves all concerns":

> The court certainly makes an affirmative finding that we do live in a small community. Four or five of these witnesses are still working in an undercover capacity. It is a small community. For officer safety I think we need to make some accommodation for their safety as well as make an accommodation for a public trial for the defendant.

> So the witnesses—the observers will be able to listen to the testimony but not see the witnesses. And I do think defense counsel's comments of highlighting the witnesses either if they came in masked and sat behind a screen might highlight their testimony. So I think our jury .... will not realize that there's no one in the courtroom because there will be a rule on witnesses. So if anyone is going to be a witness, they wouldn't be allowed in the courtroom anyway. And then all of the witnesses will testify in the courtroom in the same spot.

Appellant's counsel again voiced no objection.

The courtroom was closed during the testimony of the five undercover officers, and during that time, members of the public were allowed to listen to the testimony in another courtroom. The courtroom otherwise was open during trial for public viewing

*Id.* at 889–90 (brackets in original omitted).

After the officers testified about their investigation, discussed *supra*, *see* Trial Tr. Vol. II, at 20–224; Trial Tr. Vol. III, at 6–46, ECF No. 4-5, Sergeant Matthew McDonough testified as an expert on drug investigations.

> Sergeant McDonough explained the significance of the evidence found. Five packages recovered from the photo shop appeared to contain cocaine in its powder form, and one package contained cocaine that had "been converted back into its base form, which is known as crack." The packing of the cocaine and crack indicated that they would each be sold for $150 to $200. Other packages of cocaine found at the photo shop, which were packaged in much larger, quarter kilo amounts, indicated that the dealer had staff to whom he would give the quarter kilos to sell.

> Other items found in the photo shop were related to drug dealing. The hotplate and baking soda found in the suitcase in the office could be used to convert powder cocaine into crack cocaine. Acetone, a component of the nail polish remover, is used to wash cocaine, i.e., to dissolve the materials used in diluting the cocaine during the process of converting the cocaine to crack. Inositol is used to dilute cocaine to increase profits to dealers.

> The independence cards in other people's names, found on appellant's person, were also indicative of drug dealing activity. Sergeant McDonough explained that it is "fairly common" for people who do not have cash to purchase drugs with the funds on their independence cards by giving their cards to the dealer.

> Sergeant McDonough stated that the large amount of money recovered from the laptop bag in the storage unit, $91,000, as well as the "substantial amount of cocaine," indicated that appellant had sold a portion of an even larger amount of cocaine and was in the process of selling the remaining portion. He opined that the piece of paper that was found with the money appeared to be a ledger, where appellant kept track of money going in and out. . . .

> Evidence that appellant had spent over $18,000 on rental cars over the course of 18 months was also significant to Sergeant McDonough. He explained that drug traffickers often drive different vehicles to avoid police surveillance and avoid having their personal vehicle forfeited in the event that they get caught. Drug traffickers also tend to avoid keeping any funds in a bank as an additional measure to avoid police detection. Based on the testimony and evidence presented against appellant, Sergeant McDonough opined that appellant was a mid-to-high level drug dealer.

*Kyler*, 96 A.3d at 886–87; *see* Trial Tr. Vol. III, at 102–55.

On September 28, 2012, the jury convicted Kyler of two counts of being a drug kingpin, one count of possession with intent to distribute ("PWID") cocaine, one count of PWID cocaine

base, two counts of PWID a large amount of narcotics (also referred to as "volume dealing"),[4] one count of concealing the proceeds of a controlled dangerous substance ("CDS") offense, and one count of conspiracy to distribute cocaine. Calvert Cty. Docket Entries 21, ECF No. 4-1; Trial Tr. Vol. IV, at 52–58, ECF No. 4-6; *Kyler*, 96 A.3d at 883. The trial court sentenced Kyler to a total of 65 years' imprisonment, comprising a mix of concurrent and consecutive sentences. Calvert Cty. Docket Entries 23; *Kyler*, 96 A.3d at 883 & n.1.

Kyler filed a timely appeal to the Maryland Court of Special Appeals. Kyler's appellate brief raised the following issues:

> 1. Whether the trial court abused its discretion and violated Mr. Kyler's Sixth Amendment right to a public trial when it closed the courtroom based solely on an unsupported general proffer from the State.
>
> 2. Whether the evidence at trial was insufficient to prove beyond a reasonable doubt that Mr. Kyler was guilty of being a drug kingpin.
>
> 3. Whether the trial court erred in sentencing Mr. Kyler both for being a volume dealer and for possession with intent to distribute.

Appellant Br. Md. Ct. Spec. App. 8, ECF No. 4-8. The appellate court rejected the Sixth Amendment argument, explaining that Kyler failed to timely object to the procedure that the trial court employed during the testimony of the undercover officers and thus had not preserved the argument. *Kyler*, 96 A.3d at 890–91. The appellate court also rejected Kyler's challenge regarding the sufficiency of the evidence, relying on the circumstantial evidence of Kyler's relationship with other defendants and McDonough's expert testimony about the significance of the quantity of drugs and cash connected to Kyler. *Id.* at 894–95. As to Kyler's sentencing claim, the Court of Special Appeals concluded that the volume dealer and PWID convictions were distinct offenses and thus did not merge under the required evidence test. *Id.* at 898–99.

---

[4] Specifically, Kyler was charged with one count of PWID more than 448 grams of cocaine and one count of PWID more than 50 grams of cocaine base. *Kyler*, 96 A.3d at 883.

Nonetheless, the court agreed with Kyler's argument that the legislative history was ambiguous as to whether these two types of offenses should yield two separate sentences. *Id.* at 899–900. Accordingly, the court applied the rule of lenity and vacated the sentences for PWID. *Id.* at 900.

Kyler filed a petition for a writ of certiorari with the Maryland Court of Appeals. Kyler's petition reiterated his Sixth Amendment and sufficiency-of-the-evidence claims that were rejected by the Court of Special Appeals. Pet.'s Writ of Cert. & Or. 2–12.[5] The petition also raised a variation of the sentence merger claim, acknowledging that he had succeeded on his argument before the Court of Special Appeals but asserted before the Court of Appeals that his sentences for volume dealing and being a drug kingpin should also be merged. *Id.* at 14–15. The Maryland Court of Appeals denied Kyler's petition on December 22, 2014. *Id.* at 20. Kyler did not seek review before the United States Supreme Court, nor did he pursue state post-conviction relief. Pet. 4. On April 7, 2015,[6] Kyler timely petitioned this Court for habeas relief under 28 U.S.C. § 2254. *See* Pet.; 28 U.S.C. § 2244(d)(1)(A) (providing that a habeas petition filed within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" is timely).

## CLAIMS

In his § 2254 petition, Kyler presents the following arguments for habeas relief:

A. Ground One[:] Violation of Sixth Amendment right to public trial.

---

[5] Petitioner's petition for a writ of certiorari is contained in the same document as the Maryland Court of Appeals Order denying his petition. Pet. Writ of Cert. & Or. Additionally, when provided to this Court, this document was initially docketed as ECF No. 4-12; however, it was determined pages were missing from the original version. The full document has been provided to the Court and is docketed as ECF No. 4-13.

[6] Kyler's petition was dated April 7, 2015, Pet. 8, which is deemed the filing date pursuant to the prison mailbox rule. *See Houston v. Lack*, 487 U.S. 266, 271 (1988) (discussing prison mailbox rule).

Supporting Facts: The Maryland Courts erred in holding that the trial court did not abuse its discretion by violating petitioner's Sixth Amendment right to a public trial when the trial court closed the courtroom and locked it.

B. Ground Two: Insufficient evidence
Supporting Facts: The Maryland Courts erred in holding that there was sufficient evidence at trial to prove beyond a reasonable doubt that petitioner was guilty of being a drug kingpin.

C. Ground Three: Illegal sentence
Supporting Facts: The Maryland Courts erred in only vacating petitioner's sentence for being a volume dealer and for possession with intent to distribute under the Rule of Lenity.

Pet. 6–7.


## STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a).

## I. Threshold Considerations

### A. Exhaustion

As a matter of comity, a federal habeas petitioner challenging state proceedings generally must exhaust claims in state court; failure to exhaust a claim requires dismissal by the federal court. *See* 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509, 515–19 (1982). The exhaustion requirement is satisfied when (1) a petitioner has fairly presented all claims in state court, or (2) if no state remedies are currently available to the petitioner. *See Gray v. Netherland*, 518 U.S. 152, 161 (1996). Fair presentation requires the petitioner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," through either direct or collateral review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999). Both the operative facts and the

controlling legal principles must be presented to the state court. *Picard v. Connor*, 404 U.S. 270, 277 (1971).

In Maryland, a "complete round" of the state appellate review process may be accomplished either on direct appeal or in post-conviction proceedings. To exhaust a claim on direct appeal in non-capital cases, it must be raised in an appeal, if one is permitted, to the Maryland Court of Special Appeals and then to the Maryland Court of Appeals by way of a petition for writ of certiorari. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 12-201, 12-301. If a prisoner has not done so and there remains a reasonable possibility that there is any available procedure, either by way of direct appeal or a post-conviction proceeding, for the prisoner to secure review by the state courts, the claim is not exhausted. *See* 28 U.S.C. § 2254(c); *Gray*, 518 U.S. at 161–66.

### B. Procedural Default

If a state prisoner fails to exhaust his claims in the state court but no procedure for exhaustion remains available at the time the prisoner files his § 2254 petition, the claim is treated as exhausted but deemed procedurally defaulted. *Gray*, 518 U.S. at 161; *see also Murray v. Carrier*, 477 U.S. 478, 489–91 (failing to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46–47 (1972) (failing to raise claim during state post-conviction proceedings constituted default). Procedural default also results where a § 2254 petition seeks to raise a claim that the state court rejected "on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (internal citations omitted); *see also Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) ("If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and

that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim."). Both bases for procedural default are "grounded in concerns of comity" and respect for state laws and court rulings. *See Coleman*, 501 U.S. at 730–32.

When a claim is procedurally defaulted, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice resulting from the alleged violation of federal law; or (2) that failure to consider the claim on the merits would result in a fundamental miscarriage of justice, *i.e.*, the conviction of one who is actually innocent. *See Murray*, 477 U.S at 495–96 (1986); *Breard*, 134 F.3d at 620. "Cause" consists of "some factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." *Breard*, 134 F.3d at 620 (internal quotation marks omitted); *see also Murray*, 477 U.S. at 488 ("[T]he question of cause for a procedural default does not turn on whether counsel erred or on the kind of error counsel may have made. So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington*, [466 U.S. 668 (1984)], there is no inequity in requiring him to bear the risk of attorney error that results in a procedural default."). In order to demonstrate prejudice, a habeas petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Even when a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a

fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314–15 (1995). For this exception to apply,

> the habeas petitioner [must] show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice.

*Id.* at 327 (internal citation and quotation marks omitted).

## II. Substantive Framework

If a § 2254 petition satisfies the procedural requirements, it is evaluated on the merits. The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *See Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447, 455 (2005). The standard is "difficult to meet" and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant

Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). Thus, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* (emphasis in original). "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010). Rather, "[i]n order for a state court's decision to be an unreasonable application of [the Supreme Court's] case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (internal quotation marks omitted).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Further, although a federal court conducting habeas review under § 2254 may evaluate a state court's factual determinations and application of federal law, it is well settled that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76

(2005). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

## ANALYSIS

### I. Sixth Amendment Claim

Kyler asserts that the trial court abused its discretion and violated his Sixth Amendment right to a public trial by closing the courtroom to the public. Pet. 6–7. Kyler exhausted this claim by raising the issue with the Maryland Court of Special Appeals and in his petition to the Maryland Court of Appeals seeking a writ of certiorari. Kyler Br. Md. Ct. Spec. App. 1; Pet. Writ of Cert. & Or.1. However, this claim is procedurally defaulted because the Maryland Court of Special Appeals rejected the claim based on adequate and independent state law. *See Coleman*, 501 U.S. at 729. As the Court of Special Appeals explained,

> Pursuant to Maryland Rule 8–131(a), an appellate court ordinarily "will not decide any ... issue unless it plainly appears by the record to have been raised in or decided by the trial court." . . .
>
> In *Robinson v. State*, 410 Md. 91, 110, 976 A.2d 1072 (2009), the Court of Appeals held, "[c]onsistent with the vast majority of the courts that have spoken on the subject," that "a claimed violation of the right to a public trial must be preserved for appellate review by a timely objection at trial." The Court stated that, although an appellate court has discretion to review an unpreserved claim of error, it should do so "'only when it is clear that it will not work an unfair prejudice to the parties or to the court.'" *Id.* at 104, 976 A.2d 1072 (quoting *Jones v. State*, 379 Md. 704, 714, 843 A.2d 778 (2004)). . . .
>
> Here, although defense counsel expressed concern with the State's suggestion of erecting a screen to protect the identities of undercover police officers, stating that it might have "a chilling effect," defense counsel voiced no objection to the procedures employed by the court. Indeed, when the court suggested clearing the courtroom and setting up an alternate listening site for members of the public during the testimony of the officers, defense counsel stated that he "wouldn't have a problem with that" if it was "done in such a way that's not obvious to the jury."

> The State, not appellant, then addressed whether such an arrangement would implicate appellant's right to a public trial. After considering the State's concerns, as well as appellant's concerns about highlighting the testimony of the undercover officers, the court proposed a solution that would protect officer safety and address defense counsel's concern. Again, appellant voiced no objection to the court's proposal.
>
> Under these circumstances, it is clear that appellant's argument on appeal, that the alternative procedure employed by the court violated his constitutional right to a public trial, was not presented to the circuit court. We hold, as the Court of Appeals did in *Robinson*, 410 Md. at 105, 976 A.2d 1072, that it "would be unfair to the court and prejudicial to the State to review [appellant's] unpreserved claim of error."

*Kyler*, 96 A.3d at 890–91. Thus, because the state court's rejection of this claim was based on an adequate and independent state procedural rule, Kyler's Sixth Amendment claim is procedurally defaulted. *See id.*; *Coleman*, 501 U.S. at 729; *Breard*, 134 F.3d at 619. Further, although Kyler's Reply disputes whether the Maryland Court of Special Appeals correctly read Maryland Rule 8–131(a) and *Robinson*, Pet.'s Reply 3–4, that is an issue for the state courts to decide. It is outside the purview of this Court to review a state court interpretation of state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (holding that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").[7]

Kyler has failed to demonstrate cause and prejudice to overcome this procedural default. To demonstrate cause, Kyler must point to some "factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." *Breard*, 134 F.3d at

---

[7] In any event, the argument from Kyler's Reply concerning the interpretation of Maryland Rule 8–131(a) and *Robinson* was taken verbatim from his Reply Brief to the Court of Special Appeals. *Compare* Pet.'s Reply 3–4, *with* Kyler Reply Br. Md. Ct. Spec. App. 6–7, ECF No. 4-10. The state court considered and was plainly not persuaded by Kyler's argument that he preserved his objection under Rule 8-131(a) and *Robinson*. This Court is certainly without the authority to grant habeas relief based on an alternative reading of state law that was presented to and rejected by a state court.

620 (internal quotation marks omitted). However, Kyler does not identify,[8] nor does the Court discern, any factor that hindered Kyler's counsel from making this argument at trial. *See* Pet.'s Reply 2–5. A review of the record reveals that the trial court and the parties discussed options for the undercover officers to testify, and that Kyler's counsel had ample, unimpeded opportunity to note any objection to the plan of closing the courtroom to observers during the testimony of witness who were still functioning in an undercover capacity in ongoing investigations, while allowing them to listen to their testimony in a nearby room, yet he did not do so.[9] Trial Tr. Vol. II, at 5–11. Having concluded that Kyler has not established cause for the default, the Court does not consider whether he can demonstrate prejudice. *See Kornahrens v. Evatt*, 66 F.3d 1350, 1359 (4th Cir. 1995). Further, the Court concludes that Kyler has not made the exceptional showing necessary for applying the miscarriage of justice exception. Indeed, it is difficult to fathom how the lack of observers in the courtroom during the testimony of the undercover officers might have so infected the jury as to result in the conviction of a person that the jury otherwise would have acquitted. Accordingly, Kyler has procedurally defaulted on his Sixth Amendment claim, and he has failed to make the showing necessary to overcome such default.

## II. Insufficient Evidence Claim

Next, Kyler contends that there was insufficient evidence to support his convictions for being a drug kingpin. Pet. 7. Respondents do not dispute that the claim is both exhausted and

---

[8] In addressing Respondents' procedural default argument, Kyler unfortunately appears to treat exhaustion and procedural default as synonymous. *See* Pet.'s Reply 2 (arguing that the Court should grant habeas relief "because Petitioner states that his allegations in this Court are timely and exhausted"). Although these concepts are related, they are distinct, as explained *supra*.

[9] In fact, Kyler's counsel preferred removing observers from the courtroom to having the jury notice a difference in witnesses by having undercover officers testify behind a screen in a different location than the other witnesses. *Id.* at 7:23-24, 8:11-23.

not procedurally defaulted. Resp't's Resp. 18–27. Accordingly, the Court turns to the substance of the claim.

The standard of review for a sufficiency of the evidence claim for a petition for writ of habeas corpus is whether, after viewing evidence in a "light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This Court "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to the facts sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982) (citing *Holloway v. McElroy*, 632 F.2d 605, 641 (5th Cir. 1980)). "The credibility of witnesses is a matter solely within the province of the jury, and is not reviewable by this Court." *Pigford v. United States*, 518 F.2d 831, 836 (4th Cir. 1975); *United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989).

The elements of the drug kingpin offense are: (1) the existence of a "conspiracy to manufacture, distribute, dispense, transport in, or bring into the State a controlled substance"; (2) that the conspiracy involves a statutorily specified amount of a controlled substance (in this case, 448 grams or more of cocaine or 50 grams or more of cocaine base); and (3) that the defendant was an "organizer, supervisor, financer, or manager" of the conspiracy. *See* Md. Code Ann., Crim. Law §§ 5-612 – 5-613(a), (b); *Kyler*, 96 A.3d at 892. Although Kyler's § 2254 Petition does not specify which elements Kyler believes to be lacking evidentiary support, based on his filings with the Court of Special Appeals and his Reply in this Court, it appears that the

only element Kyler takes issue with is that he was an "organizer, supervisor, financer, or manager." *See* Kyler Br. Md. Ct. Spec. App. 28–33; Pet.'s Reply 14–19.[10]

The Court of Special Appeals explained that, in order to be an organizer, supervisor, financer, or manager, "there must be evidence that the accused acted as a leader of a drug trafficking network and he or she exercised a measure of control over the drug conspiracy." *Kyler*, 96 A.3d at 894 (citation and internal quotation marks omitted). Being a "mere player" or "important cog" in the trafficking conspiracy is insufficient. *Id.* (citing *Allen v. State*, 597 A.2d 489, 503 (Md. Ct. Spec. App. 1991); *Williams v. State*, 616 A.2d 1275, 1284 (Md. 1992)).

Although it acknowledged that "there was no direct testimony in this case that appellant exerted control over Mr. Brooks, Mr. Savoy, or Mr. Brown," the Court of Special Appeals nonetheless concluded that sufficient circumstantial evidence was presented at trial to establish that Kyler "acted as a drug kingpin, i.e., leader of the drug operation." *Id.* at 219–20. Specifically, the Court of Special Appeals noted that:

> Sergeant McDonough, an expert in drug distribution organizations, testified that appellant was a mid-to-high level drug dealer. He based his opinion on the large quantities of drugs, as well as materials used to package cocaine and crack cocaine for sale, and materials used to convert cocaine to cocaine base, or crack, found in appellant's photo shop. Moreover, the packages of cocaine found in the photo shop included: (1) packages that were packed to be sold for $150 to $200; and (2) larger, quarter kilo amounts, indicating a dealer who had staff to give the quarter kilos to sell. . . .
>
> The evidence also showed that appellant's drug operation included Mr. Brooks and Mr. Savoy, and that appellant was the leader of the operation. There was evidence that appellant visited the barbershop that Mr. Savoy co-leased with appellant, and Mr. Brooks frequented, approximately 20 times in the three month surveillance period. Appellant was seen entering and leaving the shop with a bag, and after he left, the CDS activity would increase. Mr. Savoy and Mr. Brooks sold drugs to an undercover agent. A copy of the search warrant for appellant's house was found during a search of Mr. Brooks' house.

---

[10] The sufficiency of the evidence argument advanced in Kyler's Reply repeats, almost verbatim, the argument contained in his brief to the Court of Special Appeals. *Compare* Kyler Br. Md. Ct. Spec. App. 28–33, *with* Pet.'s Reply 14–18.

In addition, almost $100,000 in cash was found inside a bag in appellant's storage unit, which was leased in his name. That bag, which matched the description of the bag that appellant was seen carrying when entering and exiting the barbershop, also contained what an expert determined was a ledger to track funds coming in and out. During the execution of the warrant for appellant's home, detectives found a money counter. Thus, in addition to being in possession of large quantities of CDS, and quantities of cocaine indicating a dealer who had staff to give large quantities of cocaine to sell, the evidence supported a finding that appellant was the person responsible for retaining large quantities of cash, as well as the means to count and track that cash. This evidence supports the jury's finding that appellant was a leader of a large drug operation, and that he managed the operation.

*Id.* at 220–21 (footnotes omitted).

Under § 2254, the state court's determination, based on the above-described circumstantial evidence, that Kyler was an "organizer, supervisor, financer, or manager" is presumed correct. It is Kyler's burden to rebut this presumption by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), but he has failed to do so. Instead, he merely repeats his argument that there was no direct evidence that he controlled Brooks, Savoy, or Brown. Pet.'s Reply 14–18. However, as noted above, the Court of Special Appeals specifically addressed this argument, but found it inadequate to undermine Kyler's conviction based on its determination that the large quantities of cocaine and crack cocaine, the packaging of the drugs into distribution-level quantities, the presence of materials for preparing crack cocaine, and more than $100,000 in cash amounted to sufficient circumstantial evidence to allow a jury to conclude that Kyler acted as the leader of a drug trafficking organization. Accordingly, Kyler is not entitled to habeas corpus relief as to his drug kingpin convictions.

### III. Illegal Sentence Claim

Finally, in his claim labeled "Illegal sentence," Kyler asserts that "[t]he Maryland Courts erred in only vacating petitioner's sentence for being a volume dealer and for possession with intent to distribute under the Rule of Lenity." Pet. 7. It is unclear from this statement what error

Kyler assigns to the state court proceedings, whether the claimed error rises to a constitutional level cognizable in a § 2254 petition, or what modification to Kyler's sentence could cure the error. As Respondents note, the Court of Special Appeals already "provided the appropriate relief under the applicable law" by merging Kyler's volume dealer sentence into his PWID sentence. Resp't's Resp. 32–33. Thus, on the face of Kyler's Petition, he is not entitled to habeas corpus relief on this claim.

Kyler's Reply elaborates on his "illegal sentence" claim, making it clear that he contends that the state courts committed error in failing to merge his PWID/volume dealer *and* drug kingpin convictions. Pet.'s Reply 19–20. "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered. However, the power to decline consideration of such arguments is discretionary, and courts are not precluded from considering such issues in appropriate circumstances." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (internal citations omitted). "[A]ppropriate circumstances" include instances where the opposing party's response addressed the counter-argument to the belatedly-raised claim in its Response or in a Surreply. *See id.* (citing cases). No such circumstances exist here.

In any event, even if properly raised, this claim would fail on the merits.[11] Kyler does not articulate how the failure to merge his PWID/volume dealer and drug kingpin convictions or sentences amounts to a constitutional error, and his argument focuses primarily on the Rule of

_____

[11] The claim also is unexhausted, as Kyler failed to present it to the Court of Special Appeals; his argument to that court only sought the merger of the volume dealer and PWID convictions and did not seek the merger of the drug kingpin convictions. *See* Kyler Br. Md. Ct. Spec. App. 33–40. However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

[12] Denial of a certificate of appealability in the district court does not preclude Kyler from requesting a certificate of appealability from the Fourth Circuit.

Lenity.  Pet.'s Reply 19–20 (arguing that the intent of all of Kyler's drug offenses "is the same – to distribute drugs.").  Thus, he does not present a cognizable claim for federal habeas corpus review.  To the extent Kyler's brief can be construed as a challenge under the Double Jeopardy Clause of the Fifth Amendment (and the Fourteenth Amendment making the Double Jeopardy Clause applicable to the states), such a claim would fail.  The Double Jeopardy Clause precludes courts from imposing two punishments for the same offense "*in the absence of a clear indication of contrary legislative intent*."  *Missouri v. Hunter*, 459 U.S. 359, 366 (1983) (*quoting Whalen v. United States*, 445 U.S. 684, 692).

> Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct . . . a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

*Id.* at 368–69.  Such legislative intent is present in Kyler's case, as the drug kingpin statute states: "Notwithstanding any other provision of th[e] title [for Controlled Dangerous Substances, Prescriptions, and Other Substances], a conviction under this section *does not merge* with the conviction for any crime that is the object of the conspiracy."  Md. Code. Ann. Crim. Law § 5-613(d) (emphasis added); *see also Kyler v. State*, 96 A.2d at 215 n.9 (noting this provision of the drug kingpin statute).  Thus, Kyler's claim of illegal sentence fails on numerous procedural grounds or, alternatively, on the merits.

## CONCLUSION

The Petition for habeas corpus relief will be denied and dismissed.  When a district court dismisses a habeas petition, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a district court dismisses a habeas petition solely on procedural grounds, a petitioner

satisfies this standard by demonstrating "(1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Rouse v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (internal quotation marks omitted); *see Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Because Kyler fails to satisfy this standard, the Court declines to issue a certificate of appealability.[12]

A separate order follows.

August 6, 2018
Date

_____/S/_____
Paul W. Grimm
United States District Judge

jml

---

[12] Denial of a certificate of appealability in the district court does not preclude Kyler from requesting a certificate of appealability from the Fourth Circuit.